**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ESTATE OF JACQUELINE NELSON, PATRICE NELSON as Personal Representative of the Estate of Jacqueline Nelson, and GEORGES MICO NELSON, | : : : : | |
| Plaintiffs, | : : | **COMPLAINT** |
| v. | : : | **Jury Trial Demanded** |
| | : : | Civ. No. _____ |
| HERMAN MILLER, INC., THE GEORGE NELSON FOUNDATION, KAREN STEIN, and KAREN D. STEIN LLC, | : : : | |
| Defendants. | : : : | |

Plaintiffs, the ESTATE OF JACQUELINE NELSON, PATRICE NELSON as Personal Representative of the Estate of Jacqueline Nelson, and GEORGES MICO NELSON (collectively "Plaintiffs"), allege as follows for their Complaint against Defendants Herman Miller, Inc., The George Nelson Foundation, Karen Stein, and Karen D. Stein LLC (collectively, "Defendants").

## NATURE OF THE ACTION

1. On information and belief, from about 2005 through the date of the filing of this Complaint, Defendant Herman Miller, Inc. ("Herman Miller") has presided over a highly complex and intentionally convoluted fraudulent scheme to steal Plaintiffs' intellectual property—that is, creations of the famous American industrial designer George Nelson—and to divert royalty payments to itself that should have been paid to Plaintiffs. The scheme played out as follows.

2. *First*, Herman Miller created Defendant George Nelson Foundation ("GNF"), a nonprofit organization over which Herman Miller, along with GNF's Director Defendant Karen Stein and her company Defendant Karen D. Stein LLC (collectively "Stein"), exerts total control and domination. While GNF purports to be a foundation designed to showcase George Nelson's

work, its true purpose is (and has always been) to garner Plaintiffs' trust and to further the fraudulent scheme.  GNF is Herman Miller's alter ego.

3.      ***Second***, Herman Miller and Stein used GNF to dupe and defraud Jacqueline Nelson—a woman in her nineties of severely diminished mental and physical capacity—into unwittingly transferring Plaintiffs' valuable intellectual property to GNF via an invalid and unenforceable intellectual property assignment agreement.

4.      ***Third***, armed with the intellectual property rights it fraudulently obtained from Plaintiffs, GNF initiated an infringement lawsuit in the United States District Court for the Southern District of New York ("SDNY") against a third party called Modernica, Inc. ("Modernica"), a California-based furniture manufacturer and a competitor of Defendant Herman Miller.  During the course of this SDNY proceeding, Defendants made intentionally false and fraudulent statements to Plaintiffs and the Court to strategically intertwine the SDNY dispute with another unrelated case that Herman Miller had filed against Modernica (the same third-party defendant) in the United States District Court for the Western District of Michigan ("WDMI"). By taking this approach, Defendants were able to craft an omnibus resolution to *both* the SDNY litigation and WDMI litigation that allowed GNF to orchestrate a direct transfer of Plaintiffs' intellectual property to Herman Miller under false pretenses.  This strategic and intentionally convoluted transfer—which was a fundamental abuse of GNF's non-profit organizational structure and in violation of numerous United States tax laws—had the effect of fraudulently stripping Plaintiffs of all right and interest in the Bubble Lamp business, even though Plaintiffs paid for the litigation directly relating to the acquisition of that business.

5.      ***Fourth***, Defendants have continued, without the authorization of Plaintiffs, to wrongfully license and use Plaintiffs' intellectual property in commerce, in violation of Plaintiffs' valid and subsisting rights.

6.      Given all of the foregoing, Plaintiffs hereby assert claims against Defendants for fraud, conspiracy to commit fraud, unjust enrichment, infringement of their intellectual property, unfair competition, and (in the alternative) breach of the intellectual property assignment agreement, for which they seek monetary damages and injunctive relief.  They also seek the cancellation of Herman Miller's fraudulently obtained federal trademark registrations, U.S. Registration Nos. 3939483 and 3939484.

## PARTIES

7.      Plaintiffs are the Estate of Jacqueline Nelson ("Mrs. Nelson"), Georges Mico Nelson ("Mico")—who is the son of Mrs. Nelson and the artist George Nelson—and Patrice Nelson, as the Personal Representative of Mrs. Nelson's estate.

8.      Mrs. Nelson was the sole devisee of all of the estate of George Nelson at the time of his death on March 5, 1986, in New York, New York.

9.      Mrs. Nelson died on December 6, 2017, just shy of her 98th birthday, in Orono, Maine.  Her estate is domiciled in Maine.

10.     Except for cash bequests to friends, Mico is sole devisee of the estate of Mrs. Nelson and will receive a distribution of the entirety of the assets of the Estate once it is closed.

11.     Mico and Patrice are domiciled in Newburgh, Maine.

12.     Upon information and belief, Defendant Herman Miller is a Michigan Corporation having a principal place of business located at 855 East Main Avenue, Zeeland, MI 49464. Herman Miller is a furniture manufacturer with operations throughout the United States, including,

3

on information and belief, two stores in New York: 251 Park Avenue S., New York, NY 10010 and 20 Hudson Yards, Unit 207C, Floor 2, New York, NY 10001.

13.     Upon information and belief, Defendant GNF is a nonprofit Michigan Corporation with its principal place of business in New York, NY.  GNF is the alter ego of Herman Miller, as discussed in greater detail below.

14.     Upon information and belief, Defendant Karen Stein is an individual domiciled in New York, NY.  Karen Stein is the Executive Director of GNF.  Upon information and belief, Karen Stein's initial compensation as GNF's Executive Director was paid directly by Herman Miller, not GNF.

15.     Upon information and belief, Defendant Karen D. Stein LLC is an entity created in the State of New York on November 29, 2007, with an office located at 24 West 55th Street, Apt 10D, New York, New York, 10019.  Upon further information and belief, Karen Stein is employed by GNF through Karen D. Stein LLC. Karen Stein is Karen D. Stein's sole member.  Upon further information and belief, Defendant Karen D. Stein LLC is Karen Stein's alter ego.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a) and (b), and 1367, as well as the supplemental and pendant jurisdiction of the Court.   Specifically, Plaintiffs' claims are predicated on the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.*, and substantial and related claims under the statutory and common law of the State of New York, the State of Maine, and the State of Michigan. Furthermore, Plaintiffs and Defendants are of diverse citizenship and the amount in controversy exceeds $75,000.

17.     This Court has personal jurisdiction over Defendant Herman Miller because, upon information and belief, it regularly does business in this State and has contributed significantly to the wrongful acts or omissions giving rise to this action, which occurred in this State.  These actions include but are in no way limited to committing trademark infringement, controlling the fraudulent acts of GNF and falsifying facts in order to manipulate a prior lawsuit taking place in this District.

18.     This Court has personal jurisdiction over Defendant GNF because, upon information and belief, it has its principal place of business in this State and has contributed significantly to the wrongful acts or omissions giving rise to this action, which occurred in this State.  These actions include but are in no way limited to committing trademark infringement and fraud, and falsifying facts in order to manipulate a prior lawsuit taking place in this District.

19.     This Court has personal jurisdiction over Defendant Karen Stein because, upon information and belief, she is domiciled in this State and has contributed significantly to the wrongful acts or omissions giving rise to this action, which occurred in this State.  These actions include but are in no way limited to controlling the fraudulent acts of GNF and falsifying facts in order to manipulate a prior lawsuit taking place in this District.

20.     This Court has personal jurisdiction over Defendant Karen D. Stein LLC because, upon information and belief, it is a New York entity with its principal place of business in this State, and because it has contributed significantly to the wrongful acts or omissions giving rise to this action, which occurred in this State.  These actions include but are in no way limited to controlling the acts of GNF and falsifying facts in order to manipulate a prior lawsuit taking place in this District. As stated above, on information and belief, Karen D. Stein is Karen Stein's alter ego.

21.     Venue is properly founded in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because Herman Miller, GNF, and Stein are subject to personal jurisdiction within this Judicial District and because a substantial part of the events giving rise to the claims occurred within this Judicial District.

## FACTUAL BACKGROUND

### I.      The Nelson IP at the Center of This Litigation

### A.      The Creator: George Nelson - A Founding Father of American Modernism

22.     George Nelson (husband of Mrs. Nelson and father of Mico) was a famous American industrial designer and one of the founding fathers of American Modernism.  During his lifetime, he created designs of many of the 20th century's most iconic modern furniture. George Nelson has been the subject and author of several books on iconic American design.

23.     George Nelson received numerous awards and recognition for his design legacy, including places in the permanent collections of the Museum of Modern Art, Brooklyn Museum of Art, and Philadelphia Museum of Art; Lifetime Achievement Award, American Institute of Graphic Arts (1991); Scholar in Residence, Smithsonian Institute National Museum of Design (1984); Chairman, International Design Conference in Aspen (1965 and 1982); Good Design Award, Museum of Modern Art (1954); Trailblazer Award, National Home Furnishings League (1954); Best Office of the Year, New York Times (1953); Gold Medal, Art Directors Club of New York (1953); and Prix de Rome for architecture (1932).

24.     George Nelson founded his own design firm, George Nelson & Associates, through which he designed many well-known modern furniture designs, and also functioned as Director of Creative Design for Defendant Herman Miller as an independent contractor.

25.     George Nelson also introduced the then-President of Herman Miller, D.J. De Pree, to Charles and Ray Eames ("Eames") and to at least two other icons of modern furniture design (Alexander Girard and Isamu Noguchi), with all of whom Herman Miller enjoyed a collaboration stretching decades and with whose heirs Herman Miller continues to collaborate to the present day.  George Nelson was instrumental in putting Herman Miller on the map of modern furniture design.

**B.      George Nelson's Iconic Bubble Lamps and Other IP**

26.     George Nelson built considerable goodwill during his lifetime in the George Nelson name and in his designs and associated common law trademarks, including, without limitation, in the lamps shown in **Exhibit "A,"** known as the "Bubble Lamps."

27.     The iconic Bubble Lamps, designed by Mr. Nelson in the early 1950's are among the most widely recognized of George Nelson's designs.

28.     At their creation, the Bubble Lamps were made by Mr. Nelson and then by others under license from him.  Mr. Nelson never transferred ownership of the Bubble Lamp designs or any related word marks to anyone during his lifetime.

29.     George Nelson himself also designed and created the unique equipment that is still used today to create the Bubble Lamps.

30.     George Nelson died on March 5, 1986.  Upon his death, his widow, Mrs. Nelson, inherited the valid intellectual property rights and interests that George Nelson held at the time of his death (the "Nelson IP"), which he had accumulated throughout his distinguished lifetime of achievement and recognition in modern American design.

31.     The Nelson IP inherited by Mrs. Nelson included various furniture designs and the common law trademarks NELSON and GEORGE NELSON (the "Nelson Marks").   It also

included the common law trademark BUBBLE LAMPS, as well as rights in the highly distinctive Bubble Lamp product designs (collectively, the "Bubble Lamp IP").

32.     The Nelson Marks and Bubble Lamp IP are quite distinctive and have acquired significant secondary meaning, by virtue of George Nelson's and Mrs. Nelson's exclusive use themselves and/or through licensees (with the exception of the infringing Defendants) for more than fifty years, as well as their extensive marketing and advertising efforts.

33.     Indeed, for years after the Bubble Lamps were initially created by George Nelson, they were manufactured and sold under license from George Nelson (and then under license from Mrs. Nelson) to a company named Howard Miller, Inc., who bore no relation to Defendant Herman Miller.  Howard Miller, Inc. used the Nelson-designed equipment to make the Bubble Lamps and paid royalties to the Nelson family.  Howard Miller Inc. ceased payment of royalties to Mrs. Nelson in 1991.

34.     In 2003, Mrs. Nelson entered into a license agreement with Vitra Collections AG ("Vitra"), a furniture manufacturer headquartered in Switzerland with close business ties to Herman Miller, to make and sell the Bubble Lamps worldwide.

35.     But unbeknownst to Mrs. Nelson and without her authorization, at some point before the Vitra license was signed, a company called Eurolighting had purchased the Nelson-designed equipment to make the Bubble Lamps from a prior manufacturer and began to make and sell Bubble Lamps in the United States through Modernica, which, as mentioned above, is a California-based furniture manufacturer and a competitor of Defendant Herman Miller.

i.    **Non-Party Modernica's Unauthorized Misappropriation of the George Nelson IP**

36.    Modernica's purchase of the Nelson-designed equipment did not, by any stretch, authorize Modernica or anyone else to sell infringing copies of the Bubble Lamps, or to use the Bubble Lamp IP or Nelson Marks in any other way.

37.    But despite its lack of ownership in any of the Nelson IP, on May 29, 2009, Modernica filed unauthorized applications Serial Nos. 77748146 and 77748149 seeking to register the trademark design configurations of the two Bubble Lamp Designs shown in **Exhibit "B"** (the "Design Applications") and application Ser. No. 78241824 to register the word mark BUBBLE LAMPS and applications to register the word marks NELSON and GEORGE NELSON with the United States Patent and Trademark Office ("USPTO").

38.    This use and attempted registration was blatant infringement and misappropriation of Plaintiffs' Nelson IP – specifically, the Nelson Marks and Bubble Lamp IP.

39.    Registration initially was refused by the USPTO to both Design Applications in Office Actions dated October 9, 2009, on the grounds that the applied-for marks consisted of non-distinctive product designs or non-distinctive features of a product design that are not registrable on the Principal Register without sufficient proof of acquired distinctiveness under §§ 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§1051-1052, 1127.

40.    Modernica responded to the Office Actions on April 9, 2010, including a Declaration of its President, Frank Novak, who improperly and fraudulently relied on the enormous recognition and goodwill in the Bubble Lamp designs garnered for over fifty years by George Nelson and his estate to assert that Modernica had developed secondary meaning in the Bubble Lamp product configurations.

41.     Specifically, Mr. Novak asserted that the Bubble Lamps "have enjoyed substantial renown due to their provenance as products designed by the famous and highly regarded George Nelson.  Over time they have come to be regarded as icons of the mid-century modernist design aesthetic."   Mr. Novak went on to explain in his Declaration that because of the specialized manufacturing process and equipment required to produce the Bubble Lamps, products bearing the Bubble Lamp design configuration, or trade dress, "have always originated from a single source and no one has ever imitated the process, or as a result, the designs that comprise …[the Bubble Lamps]."  He continued "[c]onsumers since the 1950's have thus always associated the 'George Nelson Bubble Lamps' as they are often called…with a single source, which has for the past decade plus been the Applicant, Modernica."

42.     This statement, which Mr. Novak undoubtedly knew at the time was utterly false, misleadingly asserts that Modernica is the owner of the goodwill and recognition in the Bubble Lamp IP created and owned by George Nelson.  Trademarks on product configurations, such as the design of a lamp, are difficult to obtain and require a detailed showing of consumer recognition over a long period of time, along with strong consumer recognition, significant sales and advertising.  Reliance on the status of the Bubble Lamps as "icons of the mid-century modernist design aesthetic" without any transfer from George Nelson or his successors in interest of the good will in this "iconic status" was quite simply fraudulent.  The statement was directly made to cause the U.S. Trademark Office to issue registrations to Modernica, which essentially stole the rights to the Bubble Lamp IP and fraudulently inserted itself as the owner of all rights, goodwill and recognition therein and associated therewith.

43.     Indeed, on April 5, 2010, as a direct result of Mr. Novak's fraudulent statements, the Design Applications matured into U.S. Registration Nos. 3939483 and 3939484 in the name of Modernica (the "Modernica Design Registrations").

44.     As will be discussed in Section III below, Herman Miller ended up directing GNF to sue Modernica to seek cancellation of the Modernica Design Registrations on grounds they were procured by fraud (the "Bubble Lamp Lawsuit").   As will also be discussed, Herman Miller charged Plaintiffs for, and Plaintiffs paid, legal fees incurred in the Bubble Lamp Lawsuit, as they believed the misappropriated Bubble Lamp IP would be recovered by GNF, the sole Plaintiff in that action, and that Plaintiffs would receive royalties for its subsequent use.   But, in reality, Herman Miller was the one to fraudulently obtain the Bubble Lamp IP at the conclusion of the Bubble Lamp Lawsuit, to Plaintiffs' severe detriment, as addressed in Section III below.

## II.     Herman Miller's Fraudulent Scheme to Obtain the Nelson IP

### A.     Initial, Unsuccessful Attempts to Usurp the Nelson IP from Mrs. Nelson—a Woman of Advanced Age and Rapidly Deteriorating Mental and Physical Health

45.     As mentioned previously, George Nelson had his own design company, Nelson & Associates (later known as Nelson & Co., Inc.), at the same time that he worked as Herman Miller's Creative Design Director as an independent contractor (not an employee).   Letters and documents dating back to the 1940s to 1980s reveal that Herman Miller was indeed a client of George Nelson's firm—and a bad one at that.   Herman Miller was demanding but was not particularly good in paying bills.

46.     There were no written contracts in the early days of George's work with Herman Miller, and, accordingly, there is no evidence that any of his furniture designs were created as work for hire with Herman Miller or otherwise owned by Herman Miller.

47.     Egregiously, however, after George Nelson's death, Herman Miller took advantage of the situation—in particular, of Mrs. Nelson's advanced age—to try to obtain her admission that Herman Miller (and not George Nelson) somehow owned all of George's furniture designs and related intellectual property.

48.     In fact, Vitra (which, again, had close business ties to Herman Miller) actually teamed up with Herman Miller in a campaign to convince Mrs. Nelson to unwillingly (and unwittingly) transfer all of her rights in the Nelson IP to them. Both informed her that not doing so jeopardized the Nelson IP—which was a lie.

49.     For example, on March 25, 2005, when Mrs. Nelson was 86 years old, John Berry ("Berry"), who was then a consultant to Herman Miller but who had been employed by the company as a vice president of corporate communications for 16 years in the past, wrote Mrs. Nelson a letter saying, "I know I keep harping on this point of your assigning design rights, but I do think it is important." He urged her again to reconsider transferring her rights because not "[n]ot assigning the rights puts them into the public domain and opens wide the ability to copy the designs, confuse the public and reduce royalties." *Id.* This was a lie; it is not correct that design rights go into the public domain if they are not assigned to a foundation or some other entity.

50.     Berry stated further that "[i]t is my understanding that the process of your assigning rights can be simple and my guess is that HMI [Herman Miller] would be glad to provide any legal assistance if needed. They would have a vested interest in seeing the authentic designs maintained." *Id.* The director for retail at Herman Miller, was copied on the letter. *Id.*

51.     Unsure of what to do, Mrs. Nelson reached out to Rolf Fehlbaum ("Fehlbaum"), then Chairman of Vitra, for a second opinion in April 2005. Fehlbaum responded, in an email dated May 2, 2005, forwarding an opinion from his attorney, who opined that all of George

Nelson's work belonged to Herman Miller and that Mrs. Nelson should assign her rights to an entity like Vitra or a foundation to protect it.

52.     Fehlbaum was someone who Mrs. Nelson deeply trusted, and this fact was well known by anyone who knew Mrs. Nelson, including Fehlbaum.

53.     Mrs. Nelson's trust in Fehlbaum was also noted by Philip Raible ("Raible"), her personal counsel in New York, who, in an email to Fehlbaum's attorney, stated that "Mrs. Nelson is (as you know) exceedingly close to, and comfortable with, Rolf Fehlbaum."

54.     Indeed, Herman Miller and Vitra engaged Fehlbaum whenever they wanted Mrs. Nelson to take a course of action that they desired.  In this case, though Berry had been unsuccessful in convincing Mrs. Nelson to transfer her rights, Fehlbaum's seal of approval did prompt Mrs. Nelson to rethink the proposals Berry made.

55.     However, even Fehlbaum's strong influence was not enough to persuade Mrs. Nelson this time.  It eventually became clear to Defendants that Mrs. Nelson would need a more aggressive push—and that they would need to devise a plan for delivering that push as soon as possible.

**B.     Upping the Ante: Defendants' Secret and Unauthorized Formation of the George Nelson Foundation to Obtain the Nelson IP Under False Pretenses**

56.     Over the next few years, Herman Miller increased its efforts to obtain control of the totality of the Nelson IP, recognizing that it had enormous value as some of the most iconic furniture in the world.

57.     As part and parcel to its duplicitous strategy, in late 2009 or early 2010, Herman Miller approached Mrs. Nelson about the concept of forming a nonprofit foundation—that is, GNF.

58.     Herman Miller was the leading force behind the formation of GNF.

59.     Tellingly, another leading force behind the formation of GNF was Vitra and its Chairman of the Board, Fehlbaum.

### i.     The Story Herman Miller Told Mrs. Nelson Regarding GNF

60.     Herman Miller began by emphasizing to Mrs. Nelson that the purpose of GNF would be to educate, exhibit, and advance the legacy of George Nelson's contributions to American Modernism.

61.     In or about January 2010, Berry sent a proposal for GNF to Mrs. Nelson's attorney, Raible, along with proposed Articles of Incorporation and Bylaws.  The proposal explicitly noted that the objective, in January 2010, was to "[g]ain Jacquie Nelson's granting of rights to the foundation."

62.     On March 9, 2010, Mrs. Nelson, through her attorney, Raible, reached out to Fehlbaum expressing skepticism over the need for, and the purpose and viability of, such a foundation.  However, Fehlbaum never responded to Raible's March 9, 2010, email.

63.     On May 3, 2010, a revised proposal was prepared, and, despite Mrs. Nelson's expressed concern about being forced or pressured to personally support the foundation in any way, the proposal continued to maintain its objective to "gain Mrs. Nelson's granting of rights to the foundation."

64.     In correspondence dated July 29, 2010, President and CEO of Herman Miller, Brian Walker ("Walker"), purportedly together with Fehlbaum, jointly wrote to Mrs. Nelson to formally ask for her support in establishing a foundation, to "protect, promote and extend the legacy of George Nelson's work."  They stressed that the foundation would have an "independent nature." *Id.*

14

65.     In that same correspondence, which was on Herman Miller letterhead, it was stressed that the establishment of the foundation would not require Mrs. Nelson to "make any legal transfer of rights." *Id.*

66.     In reliance on the representation that (1) Mrs. Nelson would not be required to transfer any of her rights in the valuable Nelson IP she had inherited from her husband, and (2) that GNF would educate, exhibit, and advance the legacy of George Nelson's contributions to American Modernism, Mrs. Nelson responded to Walker on August 9, 2010, telling him that that she would support development of GNF.

### ii.     The Sinister Reality of GNF, Herman Miller's Alter Ego

67.     While Herman Miller and Fehlbaum created the appearance of seeking approval from the Nelson family to create a foundation, the reality was that—unbeknownst to Mrs. Nelson (or any of the other Plaintiffs)—GNF already had been established six months before. Specifically, GNF was registered on February 11, 2010, by Herman Miller, without the Nelson family's approval or authorization, as a nonprofit Michigan corporation.  The true purpose of GNF, as discussed herein, was to function as Herman Miller's alter ego and the vehicle through which Herman Miller perpetrated (and perpetrates) widespread fraud.

68.     The Incorporator of GNF was James L. Hopewell ("Hopewell"), then Associate General Counsel of Herman Miller.

69.     The Registered Agent of GNF at the time it was secretly incorporated was Berry, then Vice President of Corporate Communications at Herman Miller.  The address of the registered office of GNF initially was, upon information and belief, Mr. Berry's home address.

70.     In 2010, the registered office of GNF was changed to (and still is) 855 E. Main Ave., Zeeland, MI 49464.  This was, and still is, the main headquarters address of Herman Miller.

71.     In 2013, the Registered Agent of GNF was changed to Tim Lopez ("Lopez"), Senior Vice President of Legal Services and Secretary of Herman Miller.  Mr. Lopez remained the Resident Agent of GNF until he left the employ of Herman Miller in October 2018.

72.     And although Walker had previously assured Mrs. Nelson that GNF would have an "independent nature," Herman Miller filled GNF's Board of Directors with individuals with close ties to itself.

73.     Specifically, in 2011, a Board of Directors was designated that included Ben Watson ("Watson"), the Executive Creative Director of Herman Miller, as President; Defendant Karen Stein, a woman with ties to Fehlbaum and Vitra, as Executive Director; Fehlbaum, as Director; Sally Wisbang, Executive Assistant at Herman Miller, as Secretary and Treasurer; and Barry Bergdoll, the Chief Curator of Architecture and Design at the Museum of Modern Art in New York ("MOMA").

### a.     Conflicts of Interest Abound at GNF

74.     Herman Miller was one of two initial donors to GNF.  The other was Vitra. Herman Miller and Vitra were, and remain, GNF's only contributors.

75.     Importantly, as a substantial contributor to the nonprofit, Herman Miller is deemed a disqualified party within the meaning 26 U.S.C. §§ 4941 and 4946 of the tax statutes.  As a disqualified party, Herman Miller is prohibited from using its relationship with GNF to engage in self-dealing transactions.  *See* 26 U.S.C. §§ 4941.  Similarly, GNF and Stein, as Executive Director, are under an obligation to avoid transactions in which a conflict of interest might exist with substantial contributors.  Indeed, GNF's bylaws and its Articles of Incorporation prohibit transactions that have even an appearance of a conflict of interest.

76.     Nonetheless, Herman Miller, Stein, and GNF ignored GNF's bylaws and its Articles of Incorporation and the relevant tax statutes, and they did not, and have not, kept the necessary boundaries to prevent a conflict of interest from happening, all to the detriment of Mrs. Nelson and the Nelson family.

77.     After forming GNF, Herman Miller manned the organization with cronies who had connections with, or were subordinate to, Herman Miller.  Herman Miller used these connections and its financial contribution to control GNF, its alter ego, and to perpetrate far-reaching fraud.

### C.     GNF Finally Succeeds in Duping Mrs. Nelson—Who Is Cognitively Impaired and Physically Incapacitated—Into Signing Away Her Intellectual Property Rights

78.     In October 2012, GNF, with the assistance of a lawyer it hired named William Dorsey ("Dorsey"), doubled down on its efforts to have Mrs. Nelson assign all of her rights in the Nelson IP to GNF via an Intellectual Property Assignment Agreement ("IPAA").

79.      Specifically, on October 24, 2012, Defendant Ms. Stein (who, again, is GNF's Executive Director) forwarded to Mrs. Nelson a draft IPAA, assigning to GNF literally all of the Nelson IP she had inherited from her husband in a broad, sweeping and irrevocable assignment and transfer.  Mr. Dorsey and Ms. Stein presented the assignment as necessary to enforce the rights in the Nelson IP (and ultimately benefit Mrs. Nelson), which was not the case.

80.     Not surprisingly, Ms. Stein sent this first draft IPAA to Mrs. Nelson via email, copying Fehlbaum (rather than Mrs. Nelson's attorney, Raible).

81.     Mrs. Nelson never responded to the email.

82.     On November 26, 2012, Mrs. Nelson suffered a fall at home and broke her hip. She also had bladder cancer and was receiving radiation therapy during this timeframe and was very weak—a point noted by Ms. Stein each time she communicated with Mrs. Nelson about the IPAA.

83.     But in spite of Mrs. Nelson's health condition, Ms. Stein forged on to get the IPAA signed.  Sometime in December 2012, Ms. Stein wrote a handwritten note forwarding a second draft of the IPAA for Mrs. Nelson's review; again there was no suggestion that Mrs. Nelson speak to Raible or another independent counsel.

84.     Mrs. Nelson did not respond to this communication either.

85.     In December 2012, Plaintiffs Mico and Patrice Nelson moved Mrs. Nelson to Maine due to her rapidly declining condition.  Mrs. Nelson was permanently disabled from the fall and needed a walker to ambulate; her apartment was not handicap accessible.  Mrs. Nelson was transported to Maine by a private ambulance on December 18, 2012.

86.     Nonetheless, Ms. Stein still persisted in getting the IPAA signed.  She emailed Mrs. Nelson at 9:50 pm on January 23, 2013, copying Patrice (rather than Mico, Mrs. Nelson's son and legal agent), and attached the "final" version of the complex IPAA that Mrs. Nelson was expected to sign.

87.     Neither Mrs. Nelson, nor Patrice, responded to the January 23 email.  However, despite their lack of a response, Dorsey sent out an express mail package with the final copy of the IPAA the next day, on January 24, 2013, with "sign here" stickers instructing Ms. Nelson where to sign.  A return Federal Express envelope was also provided.

88.     On the date the package was sent, January 24, 2013, Mrs. Nelson was 93 years old and was in a rehabilitation center/nursing home in New Castle, Maine.  She was still seriously ill from bladder cancer treatment, recovering from a hip fracture, and was suffering from a diminished mental capacity.

89.     Nonetheless, Dorsey mailed the finalized assignment directly to Mrs. Nelson to sign—and she finally did so, likely without any idea of what she was signing.

90.     Importantly, there were no witnesses to Mrs. Nelson's signing of the IPAA, and her son, Mico, who was then her legal agent under a power of attorney, was not present, nor was he directly notified of GNF's intentions with respect to the family legacy.

91.     When Mrs. Nelson signed the "final" IPAA, she wrote "1/24/2013" as the date of execution. (**Exhibit "C"** (IPAA).) Clearly, Mrs. Nelson could not have received the agreement until sometime after 1/24/2013 because that was the date Dorsey sent the forms to her. On information and belief, Mrs. Nelson saw Dorsey's cover letter, which was dated 1/24/2013, and followed suit.

92.     The signed IPAA was mailed back to Dorsey on 1/29/2013.  This transaction establishes that, at the time she was presented with the contract, Mrs. Nelson was not oriented as to time, which is one of the indicators of diminished capacity.

93.     Mrs. Nelson's treating providers in Maine determined that she lacked the capacity to execute such an agreement at that time and should not have been made to execute the same.

94.     Indeed, the issue of Mrs. Nelson's capacity to execute the IPAA was raised by at least one entity against which GNF attempted to enforce the Nelson IP.

95.     Upon information and belief, GNF's own counsel had concerns about Mrs. Nelson's capacity to sign the IPAA as well.

96.     Furthermore, even if Mrs. Nelson had the requisite cognitive capacity to sign a legal document (which she did not), she could not be expected to understand this particular complex contract on her own.  The failure to advise her to seek independent counsel in light of what she was being asked to give up is unconscionable and is prohibited under at least Maine law, which, in view of undue influence risks to older individuals, proscribes a transfer of assets valued at more

than 10% from an individual's estate without independent counsel engaged if that individual is 60 years or older. *See* 33 M.R.S.A. § 1021 *et. seq.*

97.     If such a transaction occurs, it is presumed that the transfer or execution was the result of undue influence, unless the elderly dependent person was represented in the transfer or execution by independent counsel.

98.     Herman Miller, Stein, and GNF knew that Mrs. Nelson had a private attorney, and they did not give her time to consult with that attorney, nor did they mention that she should do so.  Rather, Defendants all intentionally circumvented him, yet again, in violation of the law.

99.     It is important to point out that neither Patrice nor Mico even knew Mrs. Nelson signed the IPAA until more than a year later.

100.     Rather, Patrice found the copy of the IPAA in a Depend Adult Diaper box in March 2014 under Mrs. Nelson's bed.  Patrice asked Mrs. Nelson about the documents, and Mrs. Nelson did not recall ever signing any paperwork.

### i.     Terms of the IPAA, as Executed

101.     The final IPAA effectively put all of the Nelson IP in the hands of GNF, an organization that was a puppet and alter ego of Herman Miller, giving Herman Miller what it had been working to obtain since George Nelson died.

102.     The scheme usurped Mico's interest as Mrs. Nelson's heir, as well as his birthright to his father's creations.

103.     The IPAA did, however, acknowledge that "as consideration for the assignment of the Intellectual Property hereunder, [GNF] agrees that all royalties otherwise payable to [GNF] in connection with any (existing or future) license or assignment to any third party of the Intellectual Property . . . be paid to [Mrs. Nelson] and/or her heirs, assignees, or successors (as applicable)."

104.    The IPAA further provides that GNF "acknowledges that [Mrs. Nelson] shall have approval rights over any changes or modifications to the [Herman Miller License] or VDM Licenses – and any new licenses – during her lifetime."

105.    The IPAA also states that GNF "acknowledges and agrees that all royalties payable to [GNF] in connection with the license of any Intellectual Property to a third party is and continues to be for the benefit of [Mrs. Nelson] and/or her heirs, assignees, or successors."

106.    In addition, the IPAA indicates that GNF "shall not assign or otherwise transfer this Agreement, or any of its rights or obligations under this Agreement, without the prior written approval of the other Party."

107.    The IPAA also recognizes that "this Agreement is binding upon, and shall inure to the benefit of, the Parties and their respective heirs, executors, administrators, legal representatives, successors, and permitted assigns . . . ."

108.    However, the IPAA also contained a term making GNF the successor-in-interest of the royalty rights in the Nelson IP immediately on Mrs. Nelson's death, unless she assigned to Mico before her death.

109.    Stein and GNF were clearly hoping the Nelson family would not notice this provision.  But the family's Maine counsel did notice and petitioned the Maine Probate Court for a single transaction authority to transfer the royalty interest to Mico in order to keep it from being diverted to GNF. The Court agreed that the IPAA was deviating the royalty interest to GNF and granted the transfer of the royalty interest to Mico in September 2016.

    **ii.    The Maine and Illinois Litigation Pertaining to the IPAA**

110.    Neither Fehlbaum (Mrs. Nelson's trusted friend), Stein, GNF, nor Herman Miller discussed the propriety of transferring, out of Mrs. Nelson's estate, assets she needed to live on.

These parties also failed to mention what tax implications there might be for such a transfer, and, none of them discussed the tax pitfalls of transferring an interest to a nonprofit while retaining some interest in the assets transferred

111.    GNF and Dorsey's portrayal that GNF and the Nelson family had a "common interest" and that GNF was looking after the Nelson family's IP interest disguised GNF and Herman Miller's true intentions, which was to terminate royalty payments to the family and redirect them to GNF and to direct the Bubble Lamp IP to Herman Miller.

112.    Those underhanded intentions started to come to light in late 2016 and early 2017 and Plaintiffs filed a lawsuit in Maine to unravel that IPAA pursuant to the Maine Improvident Transfer of Title law, which is intended to protect elderly individuals from being swindled by those with whom they have close relationships, including, but not limited to, friends and fiduciaries. That action was dismissed without prejudice on April 14, 2017, to allow a new action to be filed in Illinois that would address, *inter alia*, the impropriety of the IPAA and legal malpractice claims against various attorneys.  Plaintiffs instituted the Illinois lawsuit originally on August 10, 2017, in the Circuit Court of Cook County, Illinois, Law Division (Docket No.:  2017-L-008151).  An Amended Complaint was filed on April 17, 2017.

## III.    Armed With GNF's Fraudulently Acquired Nelson IP, Defendants Negotiate a Convoluted Omnibus Settlement Agreement Resolving Two Separate Lawsuits Against Modernica that Resulted in the Transfer of the Bubble Lamp IP *from GNF to Herman Miller*

113.    In 2012, GNF's lawyer, Dorsey, began assisting GNF in addressing infringements of the Nelson IP by Modernica addressed in Section I.B.i. above—that is, the Bubble Lamp Lawsuit.  Dorsey agreed to handle this matter *pro bono*.

22

114.    In addition, Dorsey entered into a Joint Interest Agreement with Herman Miller, and he and his firm helped Herman Miller in a separate lawsuit Herman Miller brought against Modernica in WDMI, regarding furniture designed by Eames (the "Eames Lawsuit").

### A.    GNF's Bubble Lamp Lawsuit Against Modernica Becomes Improperly Intertwined with Herman Miller's Eames Lawsuit

115.    On May 21, 2013, after GNF fraudulently obtained the Nelson IP via the IPAA, Dorsey filed the Bubble Lamp Lawsuit against Modernica on GNF's behalf in SDNY.

116.    In the Bubble Lamp Lawsuit, GNF sought injunctive relief and damages for acts of infringement of the Nelson Marks, false designation of origin, unfair competition, and unfair and deceptive trade practices engaged in by Modernica in violations of the laws of the United States and the State of New York.  One of the Counts in the SDNY Lawsuit sought cancellation of Modernica's Design Registrations for two Bubble Lamp designs and the BUBBLE LAMPS word mark based on fraudulent procurement.  All of these items infringed the Nelson IP, which GNF had itself fraudulently acquired.

117.    Herman Miller, which was not a party to the Bubble Lamp Lawsuit (but was a party to the separate Eames Lawsuit in WDMI), used its connection with GNF to obtain strategic information about Modernica, some of which, upon information and belief, was subject to a stipulated protective order issued by the New York Court.  Herman Miller used this information, to which it was not entitled, to negotiate and obtain intellectual property and other rights and/or interests related to the valuable Bubble Lamp IP.

118.    Indeed, even Modernica expressed concern over the interconnectedness of GNF and Herman Miller multiple times.  Upon information and belief, in July 2014, Modernica's counsel asked Dorsey if there was a joint defense agreement between GNF and Herman Miller.  Dorsey acknowledged that GNF did, in fact, have a common interest agreement with Herman

Miller. Given that GNF's express purpose was to protect the legacy of George Nelson, it is not clear what its common interest could be with Herman Miller.

119.    The "common interest" agreement between Herman Miller and GNF that produced such a close working relationship against unrelated third parties poses serious conflict-of-interest problems for GNF, a nonprofit entity.  The agreement also demonstrates Walker's statement to Mrs. Nelson in 2010—i.e., that GNF would be "independent in nature"—was false and made solely to obtain her support.

120.    In fact, Modernica raised the interconnectedness of Herman Miller and GNF with the New York Court in the Bubble Lamp Lawsuit.  In Modernica's reply in support of its motion to compel production of documents and provide substantive interrogatory responses relating to questions raised about Herman Miller and GNF's relationship, Modernica asserted as follows:

> It is undisputed that HMI is a licensee of The Foundation. However, as contended by Defendant, HMI is much more than a licensee; it is the benefactor to The Foundation. In other words, HMI effectively operates and controls that entity. As such, as contended by Defendant, The Foundation is not a standalone not-for-profit organization, but rather, an extension of HMI's internal marketing departments.

*GNF v. Mod* (NY) (1:13-cv-03427-MMB), ECF No. 97.

121.    Given the foregoing, it is quite clear that decisions by Stein and GNF relating to the Nelson IP in the Bubble Lamp Lawsuit (and otherwise) were always made with Herman Miller's interest as key and with Herman Miller's involvement.

122.    Furthermore, despite terms in the IPAA that required consultation with Mrs. Nelson about licenses, GNF never consulted with Mrs. Nelson about any action relating to licenses after she was forced to execute the IPAA.

123.    In fact, upon information and belief, Modernica approached GNF multiple times to convey the message that they were very interested in negotiating a license to produce and sell the

Bubble Lamp in settlement of the Bubble Lamp Lawsuit, but Stein and GNF repeatedly rejected the offers because of their preference for Herman Miller and because, pursuant to the IPAA, the royalties from an agreement with Modernica would inure only to Mrs. Nelson's benefit (and not GNF or Herman Miller).

124.    Upon further information and belief, the first offer from Modernica was made even before GNF filed the Bubble Lamp Lawsuit.  Had GNF accepted, the Nelson family could have avoided the stunning legal fees from the Bubble Lamp Lawsuit, and the Bubble Lamp IP interest could have been safeguarded from Herman Miller.

125.    Instead, upon information and belief, Stein discussed with certain Board members of GNF (but not Barry Bergdol, the only board member not connected to Vitra or Herman Miller) her preference that Herman Miller produce the Bubble Lamps.

126.    Furthermore, upon information and belief, Lopez and Dorsey colluded heavily with respect to settlement opportunities in the Eames and Bubble Lamp Lawsuits that would result in the Bubble Lamp IP being transferred to Herman Miller.  Upon information and belief, it appeared that Modernica was desperate to settle the litigations and was interested in a buyout.

127.    However, Stein and Dorsey never informed the Nelson family that Modernica was interested in selling the Bubble Lamp business nor was the family ever notified that Modernica offered other options to resolve the GNF action.  This offer and the offer of other options to resolve the lawsuit was only presented to Herman Miller, which was not a party to, nor was it paying for, the Bubble Lamp Lawsuit.

**B.      Defendants Lie to the U.S. District Courts in New York and Michigan In Order to Transfer the Ownership of the Nelson IP from GNF to Herman Miller**

128.    On information and belief, throughout settlement discussions in the Eames Lawsuit and Bubble Lamp Lawsuit in 2014 and 2015, GNF and Herman Miller repeatedly misrepresented to SDNY and WDMI the nature of the intellectual property at issue and who, exactly, owned what.

129.    On further information and belief, Dorsey (who was GNF's counsel in the Bubble Lamp Lawsuit but *was not* counsel for Herman Miller in the Eames Lawsuit), actually attended a settlement conference in the Eames Lawsuit.

130.    Because of Defendants' misrepresentations, the Michigan Court did not see anything amiss and the New York Court did not have any idea that the Bubble Lamp IP at issue before it was being transferred essentially in connection with settlement of the unrelated Michigan action without Plaintiffs' knowledge or consent.

131.    The day after the conference in the Eames Lawsuit, on information and belief, Dorsey asked Modernica to agree to a stay in all scheduled depositions.

132.    Modernica and GNF then drafted a joint letter to the New York Court acknowledging that Dorsey had appeared at the Michigan settlement conference and indicating that the parties were discussing settlement.  They asked for a stay in the New York proceeding pending negotiations.

133.    On February 24, 2015, Mrs. Nelson's attorney emailed Mico, stating "Will Dorsey called me this morning to discuss a few items. . . . The second item is that he was driving to Grand Rapids to attend a mediation involving Modernica.  The principal purpose of the mediation relates to a litigation involving Modernica and Eames family/foundation, but Modernica asked Will to meet them so they can discuss possible settlement.  Will is cautiously optimistic.  He said he would let me know if any progress was made."

134.   On information and belief, however, it was not Modernica that asked Dorsey to attend the conference in Michigan.  It was Herman Miller.

135.   On further information and belief, the conference in the Eames Lawsuit was a great success for Herman Miller and was the start of the transfer of the Nelson IP to Herman Miller.  But in spite of Modernica's interest in settlement, Dorsey, who was in attendance for GNF, downplayed results to Plaintiffs, reporting that there were "no breakthroughs."

136.   Behind the scenes, however, GNF was actively involved in helping Herman Miller close the Bubble Lamp IP deal.

137.   At all relevant times, GNF and Herman Miller kept Plaintiffs and their counsel uninformed about the Bubble Lamp IP transaction and the true intentions of GNF and Herman Miller.  In fact, GNF constantly informed Plaintiffs' counsel that GNF and the Nelson family had common interests.  Given that the stated purpose of GNF was to protect the legacy of George Nelson, the Plaintiffs relied on these assurances, ultimately to their great harm.

138.   In June 2015, Plaintiffs' counsel (working with very limited information) was confused about the nature of the transfer.  He asked Lopez, "shouldn't the foundation be the signatory since the [Bubble Lamp] rights were legally transferred to them?"  Lopez responded:

> Actually No, there is the IP right and the Income right. The foundation owns the IP rights in certain instances and the Nelsons owns (sic) the right to income from the IP. So, the family has to sign since its receiving the income (the royalty). The foundation has to Agree and Acknowledge the agreement once signed, however. I have discussed this issue with the Foundation's counsel and he agrees. I have copied Will.

This response was untrue and misleading.  Regarding the Bubble Lamp IP, GNF owned it as part of the Nelson IP transferred through the IPAA, but since the Bubble Lamp IP was not being licensed at the time by GNF, the Nelson family had no royalty (or "income" rights) in the Bubble

Lamp IP.  Upon information and belief this statement was made to confuse the issues further and get Plaintiffs to sign off on the fraudulent deal with Modernica.

139.    On information and belief, throughout July 2015, Lopez and Dorsey continued to collude heavily with respect to settlement opportunities in the Eames and Bubble Lamp Lawsuits that would result in the Bubble Lamp IP being transferred to Herman Miller.

140.    Absent Herman Miller, GNF, and Stein's deceptive behind-the-scene actions (individually and collectively) and Herman Miller's undue influence over GNF, GNF would have obtained the infringing Modernica Design Registrations at issue and/or would have agreed to settle its suit with Modernica with the payment of a lump sum and/or royalties to Plaintiffs, who desired this result.  GNF was aware that Plaintiffs desired such a resolution and specifically did not allow for a negotiation of a license with Modernica because Herman Miller did not desire that result.

141.    Instead, despite the clear violation of its own conflict-of-interest policy, GNF unanimously voted to authorize Herman Miller acquiring the Bubble Lamp IP.

142.    On information and belief, no Board member abstained from voting—even though all, save possibly one Board member, Barry Bergdoll, had close relationships with Herman Miller that violated the GNF conflict-of-interest policy.

143.    Upon information and belief, even Mr. Bergdoll had a conflict of interest because Herman Miller has donated George Nelson designs to MOMA.  Plaintiffs assert that this donor/donee relationship with MOMA causes Mr. Bergdoll to have a conflict of interest as well. The consequence of this conflict of interest is that there was no truly independent member on the GNF Board to approve the transaction relating to the Bubble Lamp IP.

144.    The unanimous vote resulted in a very curiously worded acknowledgement from GNF entitled "Acknowledgement of Addendum to Royalty Agreement for Nelson Branded Lamp

Products" ("GNF Acknowledgment"), executed on September 17, 2015, that purported to sanction the Bubble Lamp transaction and to address Herman Miller's license with the Nelson family on non-Bubble Lamp products, leaving the Plaintiffs to believe that GNF was going to own the Bubble Lamp IP and that they were going to get royalties on the additional non-Bubble Lamp products.

145.    In the Addendum, there were two categories of George Nelson design products addressed by the Addendum, one related to the "Nelson *branded* Bubble Lamp Products" and the other related to "Nelson *branded* products not covered in the March 22, 2006 Royalty Agreement."

146.    Unbeknownst to Plaintiffs and their counsel (who relied on false explanations of Herman Miller about the nature of the transfer—discussed above), the word "branded" was very significant, meaning that Herman Miller was responsible for paying royalties only if the designs were actually branded with the George Nelson name.  If the design was not branded with the George Nelson name, the Nelson family gets nothing.  GNF never authorized the payment of royalties on the additional non-Bubble Lamp products to Plaintiffs.  Further the Addendum only provides for royalties on the Bubble Lamps if they are branded with the NELSON or GEORGE NELSON name.  This is because Defendants knew Herman Miller now owned the Bubble Lamps and wouldn't be paying royalties on something they owned.

**C.    The Eames Lawsuit and Bubble Lamp Lawsuit Settle, and Herman Miller (Who, Again, Was Not Even a Party to the Bubble Lamp Lawsuit) Gets the Bubble Lamp IP**

147.    The Bubble Lamp Litigation settled on September 17, 2015.  The settlement was completely controlled by Herman Miller, who, again, was not a party to that action.

148.    In the settlement, Herman Miller paid to purportedly obtain intellectual property and other rights and/or interests related to the Bubble Lamp IP.  Herman Miller now claims

ownership of any intellectual property rights relating to and/or the interests in the Bubble Lamps and the molds and equipment used to manufacture the Bubble Lamps. This includes but is not limited to the Modernica Design Registrations.

149.    Although he originally offered to handle the Bubble Lamp infringement matter on a *pro bono* basis, Dorsey charged over $800,000 in attorney's fees, which were assessed wholly against the Nelson family in the form of credits against Herman Miller royalties. The family paid back Herman Miller for the fees charged by Dorsey's firm in full by December 2019.

150.    Even though they were saddled with the litigation costs, Plaintiffs received no intellectual property rights and/or interests as part of the settlement and obtained encumbered royalty benefits on the Nelson Marks from the lawsuit. Because of Defendants' deceptive schemes, the Nelson family thought the Bubble Lamp IP had been transferred to GNF after the Modernica action was settled. This obviously did not happen.

151.    The Nelson family reasonably believed that they were receiving royalties for the Bubble Lamp IP interests. They are not.

152.    After the transaction, Herman Miller worked to camouflage how the Bubble Lamp IP sale was effected because it knew the transfer was dubious in nature.

153.    For example, on its website, Herman Miller misstated how the Bubble Lamp IP was obtained and acknowledged that the acquisition was only possible because of the GNF suit against Modernica. The company reported that a "recent agreement between Modernica and the George Nelson Foundation has resulted in Herman Miller assuming the global rights to manufacture and distribute the Nelson$^{TM}$ Bubble Lamps, as well as the right to use related trademarks and intellectual property." Tellingly, Herman avoided mentioning that it owned the Bubble Lamp interest.

154.    Furthermore, in its annual report for 2016, Herman Miller reported that it purchased the Bubble Lamp IP interest for about $6 million, but the transaction was heavily leveraged against other claims involving the Eames designs.   Accordingly, the price allocated to the sale by Modernica and Herman Miller is deceiving and does not take into account damages and other settlement options offered to GNF and Plaintiffs.

155.    Indeed, the Bubble Lamp sales since 2015, as shown on the royalty statements, reveal that the price negotiated to purchase the Bubble Lamp IP interest was extremely low and that the Bubble Lamp IP interest has an exorbitant value.   It is noteworthy that the royalty statements show the royalties being paid are based on wholesale sales figures, which is substantially less than the retail sale figures for the lamps.   Plaintiffs further believe Herman Miller may also be paying royalties to Stein and GNF from the Nelson IP and reporting such payments as expenses, which would further deflate the sales figures reported in the royalty statements provide to the Nelson family.

156.    This is all pivotal because the royalty statements do not accurately indicate the enormous value of the Bubble Lamp IP interest.   GNF, by allowing such a valuable asset to be transferred to Herman Miller, violated conflict of interest rules imposed by the tax laws (and by its own bylaws), which proscribe self-dealing transactions between a nonprofit and its substantial contributor.

**IV.    Ial After Improperly Obtaining the Bubble Lamp IP, Herman Miller Makes Fraudulent Misrepresentations to the USPTO Relating to the Bubble Lamp IP**

157.    Despite the fact that Herman Miller's puppet and alter ego GNF argued in this very District in the Bubble Lamp Lawsuit that the Modernica Design Registrations were procured by Modernica through fraud, Herman Miller was assigned (through its own fraudulent scheme) those very Modernica Design Registrations as part of the settlement of that litigation.   Herman Miller is

the current owner of the Modernica Design Registrations; indeed, the registrations were simply transferred from one infringer (Modernica) to another infringer (Herman Miller).

158.    Notably, as mentioned above, counsel for the Plaintiffs had filed a complaint in Maine on November 23, 2016, alleging that the assignment from Mrs. Nelson to GNF was an "improvident transfer" and demanding that it be set aside.  Plaintiffs had sent that complaint to Herman Miller's General Counsel, Tim Lopez on November 29, 2016.  Mr. Lopez, however, refused to accept it and advised Plaintiffs' counsel to send it to Dorsey, GNF's counsel.

159.    Despite the foregoing, a few weeks later, on December 22, 2016, Lopez, in his capacity as Herman Miller's General Counsel, filed a voluntary declaration in connection with each of the Modernica Design Registrations, asserting that "[T]here has been no final decision adverse to the owner's claim of ownership of such mark for such goods and/or services or to the owner's rights to register same or to keep the same on the register; **and there is no proceeding involving said rights pending and not disposed of either in the Patent and Trademark Office or in the courts**." (Emphasis added).  The Declaration was not filed until three months later, on March 21, 2017.

160.    Mr. Lopez knew that the foregoing statement was false when he made it and did so with the intent that the USPTO would grant "incontestable" status to the fraudulently procured Modernica Design Registrations.  Upon information and belief, Mr. Lopez quickly signed the Declaration even though it was not filed for three months so he could deny knowledge of Plaintiffs' action challenging the transfer of Nelson IP, including the Bubble Lamp IP.

161.    On May 8, 2017, the USPTO granted incontestable status to the Modernica Design Registrations—which it surely would not have done had Mr. Lopez not submitted false and fraudulent information.

## V.   **Defendants Also Make Material Misrepresentations to the IRS, Which Has Harmed and Will Continue to Harm to Plaintiffs**

162.   To engineer the transfer of the Bubble Lamp IP to Herman Miller, Herman Miller, Stein, and GNF also collaborated in a complex web of deception that included filing tax returns with false information with the IRS.

163.   Specifically, Herman Miller fronted the cost associated with the Bubble Lamp Litigation—that is, GNF's lawsuit against Modernica—through a loan agreement executed on June 4, 2014.   However, the loan was never reported on the GNF's tax filings.   A loan between a nonprofit and a substantial contributor must be reported to the IRS.   On the Foundation's tax filings for 2014 and 2015, however, the loan advanced was always documented as a charitable contribution.

164.   Stein and GNF also filed tax returns with false information, either by omitting relevant information or by falsifying information that was reported.   Omissions on the part of Stein and GNF include not reporting the transfer of the Nelson IP to GNF in 2013, not reporting the royalty payment to the Nelsons from the Nelson IP, not reporting Herman Miller's loan to GNF, and not reporting Herman Miller's royalty contracts with Stein and/or GNF but reporting substantial net investment income that could only come from royalties.

165.   Importantly, allowing the transfer of the Bubble Lamp IP interest to Herman Miller was an indirect transfer to a substantial contributor, which is proscribed by the tax laws and regulations.   Not surprisingly, Stein and GNF did not report that transaction.

166.   Stein and GNF also misrepresented Herman Miller's loan to GNF for attorney's fees in the Bubble Lamps Lawsuit by re-characterizing it as a charitable contributions in 2014 and 2015.

167.    Although Herman Miller very likely took a tax deduction for this "charitable contribution," it was paid back for this amount in full by the Nelsons.

168.    Stein and GNF also have mischaracterized the contributions from Herman Miller and Vitra by describing the contributions as both charitable contributions and as net investment income, which is not allowed. Net Investment Income is derived from an asset that produces income, i.e., interest, dividends, rentals, and/or *royalties*.  Accordingly, allocating any part of a "contribution" from a donor as Net Investment Income is inappropriate.

169.    Ms. Stein and GNF, by filing tax returns with false information or with intentional omissions, are putting the Nelson IP at risk of being reached for IRS penalties or, worse, being transferred in a manner inconsistent with the IPAA because of involuntary dissolution required by the IRS and/or the Michigan Attorney General, again to the great detriment of Plaintiffs.

170.    Specifically, non-profit organizations are generally required to transfer their assets to another nonprofit in the event of a dissolution.  26 U.S.C. § 507.  To ensure this result, the State of Michigan, which is the State in which GNF was formed, provides that consent to a dissolution must be obtained from the Michigan Attorney General.  The IRS must also consent to a dissolution.

171.    GNF's Dissolution term includes an unconventional provision that allows assets to be returned to a donor under certain conditions.  This term is not consistent with the tax laws, and if an asset (the Nelson IP) that was donated to a nonprofit (GNF) is returned to a private party donor (the Nelson family) without the preapproval of the IRS and/or the Michigan Attorney General, such term may be disallowed, to the great detriment of Plaintiffs. Defendants never informed Mrs. Nelson of this possible result.

172.    Herman Miller also filed false tax information that implicates Plaintiffs.  It issued 1099-MISC forms to Plaintiffs that did not include income deducted to repay Herman Miller's loan.

173.    The tax laws proscribe a substantial donor from engaging in self-dealing activities.

174.    Herman Miller used its influence as a substantial contributor to, and as the entity that created, GNF to secure GNF's cooperation in effectuating the transfer of the Bubble Lamp IP interest to Herman Miller.  That transfer makes Herman Miller the quintessential self-dealer.

## VI.    Defendants Continue to Infringe Plaintiffs' Nelson IP and Fraudulently Divert Royalties Away From Plaintiffs

175.    Upon information and belief, as of the date of this filing, GNF continues to license to Herman Miller, and Herman Miller continues to use in commerce and license to others, Plaintiffs' Nelson IP, including the Bubble Lamp IP it now fraudulently owns outright, without authorization from Plaintiffs.  Because the IPAA is null and void, such conduct amounts to infringement of Plaintiffs' valuable intellectual property.

176.    Furthermore, upon information and belief, in August 2014, Herman Miller suggested that GNF create another entity to retain royalties fraudulently diverted from the Plaintiffs through GNF's licensing activities.

177.    Upon information and belief, that new entity still exists and GNF, at the instruction of Herman Miller, still is diverting royalties away from Plaintiffs and into this unknown entity.

178.    In addition, on November 22, 2017, in connection with its efforts to register the marks HERMAN MILLER COLLECTION DESIGNED BY GEORGE NELSON, Ser. No 87371960, Herman Miller explained to the USPTO that "[t]he George Nelson Foundation licensed the GEORGE NELSON name for Herman Miller's use in connection with furniture designed by George Nelson.  Herman Miller's use and registration of the HERMAN MILLER COLLECTION

DESIGNED BY GEORGE NELSON and Design mark is consistent with the terms of the license agreement." The USPTO responded that in typical license agreements there is no "unity of control" between a licensor and licensee to support registration of a licensed mark by a licensee. Rather than get into the specifics of its relationship with GNF or the details of the alleged license, Herman Miller abandoned the application.

179.   Plaintiffs have never received royalties for any license between GNF and Herman Miller, contrary to the IPAA.

180.   Herman Miller also filed at least one lawsuit alleging infringement of the BUBBLE LAMPS word mark, common law rights in the Bubble Lamp IP and trademark rights in certain of the bubble lamp word marks obtained from Modernica. Specifically, on April 9, 2020, Herman Miller filed a lawsuit entitled *Herman Miller and Design Within Reach v. Interior Icons*, 20 CV 00312 in the Western District of Michigan. That case settled by consent judgement and was closed on October 23, 2020. Upon information and belief Herman Miller received monetary settlement in connection with that judgement.

181.   Neither Herman Miller nor GNF ever disclosed the *Interior Icons* lawsuit nor its result to Plaintiffs.

182.   These infringing and fraudulent intentional acts on the part of all Defendants support the pattern of deceptive and corrupt conduct that pose great harm to Plaintiffs, necessitating both monetary and equitable relief.

## COUNT I

### FRAUD
**(*Plaintiffs v. Defendants*)**

183.   Paragraphs 1 through 182 are incorporated herein as if set forth in full.

184.   As explained above, Defendants have engaged in a long-running intentional

fraudulent scheme to obtain the Nelson IP through false pretenses and to divert royalty payments to themselves that should have been paid to Plaintiffs.

185.    Indeed, Herman Miller created a sham entity and alter ego—that is, GNF—for the sole purpose of duping Mrs. Nelson into unwittingly turning over the Nelson IP.

186.    Defendants stressed from the get-go that GNF would have an independent nature, that its sole purpose would be to showcase and honor George Nelson's work and to benefit the Nelson family, and that its establishment would not require Mrs. Nelson to make any legal transfer of rights.

187.    Of course, Herman Miller and its agents knew these material representations were false at the time they were made.

188.    Herman Miller and its agents made the material representations with the intent that Mrs. Nelson would reasonably rely on them—which she did, to her (and the other Plaintiffs') extreme detriment.

189.    Specifically, in reliance on the representation that GNF would be independent and that she would not be required to make any legal transfer of her rights in the valuable intellectual property she had inherited from her husband, Mrs. Nelson gave her support to the formation of GNF.

190.    But despite the false promise that GNF would be independent, Herman Miller immediately stacked the GNF board with individuals with close ties to itself (including Stein).

191.    Herman Miller then used these relationships to direct and control GNF's activities.

192.    Indeed, as discussed above, GNF and Herman Miller's attorneys and agents drafted all versions of the IPAA, which Defendants aggressively pressed Mrs. Nelson to sign.  In doing so, Defendants falsely represented to Mrs. Nelson on numerous occasions that entry of the

assignment was necessary to enforce the rights in the Nelson IP (and ultimately benefit Mrs. Nelson), which was not the case.

193.    Defendants knowingly and intentionally sent Mrs. Nelson drafts of the IPAA while she was in a nursing home/rehabilitation facility and/or when she was receiving radiation therapy for bladder cancer and was very weak.

194.    Defendants knowingly and intentionally sent Mrs. Nelson drafts of the IPAA to Mrs. Nelson via email without copying her personal attorney, who they knew was representing her.

195.    Defendants also knowingly and intentionally sent the final version of the IPAA via email to Mrs. Nelson and Patrice—instead of Mrs. Nelson's legal agent under a power of attorney, Mico—when Mrs. Nelson was of significantly diminished capacity and/or incapacitated.

196.    On the date a physical package was sent to Mrs. Nelson containing the final IPAA, January 24, 2013, Mrs. Nelson was 93 years old and was in a rehabilitation center/nursing home in New Castle, Maine.  She was then still seriously ill from bladder cancer treatment, recovering from a hip fracture, and was suffering from a diminished mental capacity.  There were no witnesses present upon receipt, and her son, Mico, who was then her legal agent under a power of attorney, was not present, nor was he directly notified of GNF's intentions with respect to the family legacy.

197.    When Mrs. Nelson signed the "final" IPAA, she wrote "1/24/2013" as the date of execution.  Ex. C.  Clearly, Mrs. Nelson could not have received the agreement until sometime after 1/24/2013 because that was when the package was sent to her.  On information and belief, Mrs. Nelson saw the cover letter, which was dated 1/24/2013, and followed suit.

198.    The signed IPAA was mailed back to Dorsey on 1/29/2013.  This transaction establishes that, at the time she was presented with the contract, Mrs. Nelson was not oriented as to time, which is one of the indicators of diminished capacity.

199.    At the time she signed the IPAA, Mrs. Nelson suffered from limited mobility and significant loss of cognitive capacity such that she was wholly or partially dependent upon one or more persons for her basic needs, care, and support.

200.    Mrs. Nelson's physician at the time determined that she lacked capacity to execute the IPAA.

201.    Indeed, the issue of Mrs. Nelson capacity to execute the IPAA was raised by at least one entity against which GNF attempted to enforce the Nelson IP.

202.    Upon information and belief, GNF's own counsel had concerns about Mrs. Nelson's capacity to sign the IPAA as well.

203.    Even if Mrs. Nelson had the requisite cognitive capacity to understand and sign the IPAA (and she did not), GNF knew or should have known that Mrs. Nelson lacked the understanding and/or knowledge of the scope of the IPAA and related risks and consequences. Nonetheless, Defendants forwarded the IPAA directly to Mrs. Nelson and coerced her to sign it without including her personal attorney.

204.    The foregoing conduct of Defendants constitutes fraudulent inducement, wrongful undue influence, and duress.

205.    In addition, the foregoing conduct of GNF, Herman Miller, and their agents (including Stein) constitutes abuse of an elderly dependent person by procuring an irrevocable assignment of the Nelson IP and facilitating the disposition of valuable rights from an elderly woman without paying for those rights.

206.    The foregoing conduct of Defendants also constitutes, *inter alia*, a violation of the Maine Improvident Transfer of Title Act (33 M.R.S.A § 1022).  Specifically, pursuant to the Maine Improvident Transfer of Title Act, Mrs. Nelson's transfer of the Nelson IP to GNF is presumed to have been the result of undue influence because Mrs. Nelson was not represented by independent counsel in connection with the IPAA.

207.    Then, armed with GNF's fraudulently acquired Nelson IP—and in furtherance of the fraudulent scheme—Defendants subsequently lied to SDNY and WDMI in order to negotiate a convoluted (and highly improper) omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit that resulted in the transfer of the Bubble Lamp IP from GNF to Herman Miller.  This transfer of the Bubble Lamp IP interest to Herman Miller was an indirect transfer to a substantial contributor, which is proscribed by the tax laws and regulations of the United States.

208.    Upon information and belief, all of GNF's decisions relating to the Nelson IP (including but not limited to those that were made during the Bubble Lamp Lawsuit and Eames Lawsuit) were made for the benefit of Herman Miller, not George Nelson's legacy or the Nelson family.

209.    Indeed, Herman Miller, which was not even a party to the Bubble Lamp Lawsuit, used its connection with GNF to obtain strategic information about Modernica, and then used the information to negotiate and obtain intellectual property and other rights and/or interests related to the valuable Bubble Lamps.

210.    And, despite terms in the IPAA that required consultation with Mrs. Nelson about licenses, GNF never consulted with Mrs. Nelson about any action relating to licenses—including those that were proposed during the Bubble Lamp Lawsuit and Eames Lawsuits.  Rather, Defendants and their agents repeatedly provided false information to Plaintiffs (on which Plaintiffs

reasonably relied) regarding the nature and extent of their interests in the IP at issue throughout the duration of the settlement negotiations.

211.    Furthermore, Plaintiffs were duped into believing that the omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit would result in the infringing Bubble Lamp IP being turned over to GNF and that Plaintiffs would be receiving royalties for the Bubble Lamp IP interests.  These fraudulent misstatements resulted in Plaintiffs paying exorbitant legal fees for the Bubble Lamp Lawsuit.

212.    To date, Defendants continue to benefit from their fraudulent scheme, as they continue to collect royalties which rightfully belong to Plaintiffs, infringe Plaintiffs' valuable intellectual property, and enjoy fraudulently obtained tax benefits—all to Plaintiffs' extreme detriment.

213.    Defendants' conduct clearly constitutes fraud, for which Plaintiffs are entitled to actual damages, punitive damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

## COUNT II

### CONSPIRACY TO COMMIT FRAUD
### (*Plaintiffs v. Defendants*)

214.    Paragraphs 1 through 182 are incorporated herein as if set forth in full.

215.    As set forth above, Defendants intentionally acted in concert in pursuit of a long-running intentional fraudulent scheme to obtain the Nelson IP through false pretenses and to divert royalty payments to themselves that should have been paid to Plaintiffs.

216.    Defendants agreed to act in concert in furtherance of the common purpose of obtaining the Nelson IP from Plaintiffs and to divert royalty payments to themselves that should have been paid to Plaintiffs.

217.   In furtherance of the conspiracy, Defendants committed the acts described herein, including creating GNF as a sham entity for the sole purpose of duping Mrs. Nelson to unwittingly turn over the Nelson IP.

218.   Defendants stressed from the get-go that GNF would have an independent nature, that its sole purpose would be to showcase and honor George Nelson's work and to benefit the Nelson family, and that its establishment would not require Mrs. Nelson to make any legal transfer of rights.

219.   Of course, Herman Miller and its co-conspirators knew these material representations were false at the time they were made.

220.   Herman Miller and its co-conspirators made the material representations with the intent that Mrs. Nelson would reasonably rely on them—which she did, to her (and the other Plaintiffs') extreme detriment.

221.   Specifically, in reliance on the representation that GNF would be independent and that she would not be required to make any legal transfer of her rights in the valuable intellectual property she had inherited from her husband, Mrs. Nelson gave her support to the formation of GNF.

222.   But despite the false promise that GNF would be independent, Herman Miller immediately stacked the GNF board with individuals with close ties to itself (including Stein).

223.   Herman Miller then used these relationships to direct and control GNF's activities.

224.   As discussed at length in Count I (incorporated herein by reference), Herman Miller and Stein—through GNF—fraudulently duped severely ailing, 93-year old Mrs. Nelson into signing the IPAA, which effectively put all of the Nelson IP into the hands of GNF.

225.    Then, armed with GNF's fraudulently acquired Nelson IP, Defendants subsequently lied to SDNY and WDMI in order to negotiate a convoluted (and highly improper) omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit that resulted in the transfer of the Bubble Lamp IP from GNF to Herman Miller.  This transfer of the Bubble Lamp IP interest to Herman Miller was an indirect transfer to a substantial contributor, which is proscribed by the tax laws and regulations of the United States.

226.    Upon information and belief, all of GNF's decisions relating to the Nelson IP (including but not limited to those that were made during the Bubble Lamp Lawsuit and Eames Lawsuit) were made for the benefit of Herman Miller, not George Nelson's legacy or the Nelson family.

227.    Indeed, Herman Miller, which was not even a party to the Bubble Lamp Lawsuit, used its connection with GNF to obtain strategic information about Modernica, and then used the information to negotiate and obtain intellectual property and other rights and/or interests related to the valuable Bubble Lamps.

228.    And, despite terms in the IPAA that required consultation with Mrs. Nelson about licenses, GNF never consulted with Mrs. Nelson about any action relating to licenses—including those that were proposed during the Bubble Lamp Lawsuit and Eames Lawsuits.  Rather, Defendants and their co-conspirators repeatedly provided false information to Plaintiffs (on which Plaintiffs reasonably relied) regarding the nature and extent of their interests in the IP at issue throughout the duration of the settlement negotiations.

229.    Furthermore, Plaintiffs were duped into believing that the omnibus settlement of the Bubble Lamp Lawsuit and Eames Lawsuit would result in the infringing Bubble Lamp IP being turned over to GNF and that Plaintiffs would be receiving royalties for the Bubble Lamp IP

interests.  These fraudulent misstatements resulted in Plaintiffs paying exorbitant legal fees for the Bubble Lamp Lawsuit.

230.    To date, Defendants continue to benefit from their fraudulent scheme, as they continue to collect royalties which rightfully belong to Plaintiffs, infringe Plaintiffs' valuable intellectual property, and enjoy fraudulently obtained tax benefits—all to Plaintiffs' extreme detriment.

231.    As a direct and proximate result of Defendants' conspiracy and its resulting fraudulent conduct, Plaintiffs have suffered and will continue to suffer damages

232.    Accordingly, Plaintiffs are entitled to actual damages, punitive damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

**COUNT III**

**UNJUST ENRICHMENT**
**(*Plaintiffs v. Defendants*)**

233.    Paragraphs 1 through 182 are incorporated herein as if set forth in full.

234.    Defendants have gained appreciable benefits, including financial benefits and tax benefits, as a result of fraudulently obtaining the Nelson IP from Mrs. Nelson and/or obtaining the Nelson IP for less than full consideration.

235.    Defendants have also gained appreciable benefits from wrongfully collecting licensing fees associated with the Nelson IP, which should have gone to the Estate of Jacqueline Nelson and/or Mrs. Nelson's heir, Mico, instead.

236.    Plaintiffs have not received full compensation in exchange for the benefits received by Defendants.

237.    It is inequitable for Defendants to retain the benefits without payment of full value for them.

238.    Defendants have been unjustly enriched by virtue of their wrongful conduct.

239.    On information and belief, Defendants' acts are willful, wanton, calculated to deceive, and undertaken in bad faith.

240.    Equity requires Defendants to compensate the Estate of Jacqueline Nelson (and/or her heirs) for the money owed.

241.    A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants relating to the Nelson IP.

242.    There is no basis in law for Defendants to retain any sum of money improperly withheld from the Estate of Jacqueline Nelson and/or Mrs. Nelson's heirs.

243.    If allowed to retain the wrongfully obtained sums of money, Defendants would be unjustly enriched.

### COUNT IV

**TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION
PURSUANT TO THE LANHAM ACT, 15 U.S.C. § 1125(a)
(*Plaintiffs v. Herman Miller and GNF*)**

244.    Paragraphs 1 through 182 are incorporated herein as if set forth in full.

245.    For the reasons set forth in Count I above, the IPAA is null, void and unenforceable.

246.    Jacqueline Nelson was previously the sole owner of and had rights to use and license the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP.

247.    The Estate of Jacqueline Nelson is now the sole owner of and has rights to use and license the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP, and Mico Nelson has sole interests in the royalties in the Nelson IP.

248.    The Estate's rights and Mico's rights (and, before that, the rights of George Nelson and Jacqueline Nelson) in the Nelson Marks and the Bubble Lamp IP predate Defendants' first use of the Nelson Marks and the Bubble Lamp IP.

249.    The Nelson Marks and the Bubble Lamp IP are in full force and effect.

250.    The Nelson Marks and the Bubble Lamp IP are nationally recognized, including within the Southern District of New York, in connection with furniture, lighting and related products.

251.    Herman Miller and GNF's continuing unauthorized use of the Nelson Marks and the Bubble Lamp IP in connection with the purchase and offer for sale of furniture and lighting is likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Herman Miller and/or GNF with Plaintiffs, or as to the origin, sponsorship, or approval of Herman Miller's goods or commercial activities by another person, in violation of 15 U.S.C. § 1125(a).

252.    As a direct and proximate result of Herman Miller and GNF's continuing unauthorized use of the Nelson Marks and the Bubble Lamp IP, the Estate and Mico have suffered and will continue to suffer substantial injury to the business, reputation, and goodwill of George Nelson's legacy.

253.    By using the Nelson Marks and the Bubble Lamp IP without the Estate's and Mico's approval or consent, Herman Miller and GNF have willfully infringed the Estate's and Mico's rights with the intent to trade upon the fame and goodwill associated with the Nelson Marks and the Bubble Lamp IP.

254.    Herman Miller and GNF's acts as alleged herein were committed with the intent to pass off their goods and services as the goods and services of, approved by, sponsored by, or affiliated with Plaintiffs, and with the intent to deceive and defraud the public.

255.    The intentional nature of Herman Miller's and GNF's wrongful acts renders this case exceptional pursuant to 15 U.S.C. § 1117.

46

256.     The Estate and Mico are entitled to actual damages, lost profits, treble damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

257.     In addition, Mico and the Estate have been, are now, and will be irreparably harmed by Herman Miller's and GNF's wrongful acts, unless enjoined by this Court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

## COUNT V

**COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**
(*Plaintiffs v. Herman Miller and GNF*)

258.     Paragraphs 1 through 182 are incorporated herein as if set forth in full.

259.     For the reasons set forth in Count I above, the IPAA is null, void and unenforceable.

260.     Jacqueline Nelson was previously the sole owner of and had rights to use and license the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP.

261.     The Estate of Jacqueline Nelson is now the sole owner of and has rights to use and license the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP, and Mico Nelson has sole interests in the royalties in the Nelson IP.

262.     The Estate's and Mico's rights (and, before that, the rights of George Nelson and Jacqueline Nelson) in the Nelson Marks and the Bubble Lamp IP predate Defendants' first use of the Nelson Marks and the Bubble Lamp IP.

263.     The Nelson Marks and the Bubble Lamp IP are in full force and effect.

264.     The Nelson Marks and the Bubble Lamp IP are nationally recognized, including within the Southern District of New York, in connection with furniture, lighting and related products.

265.     Herman Miller and GNF's continuing unauthorized use of the Nelson Marks and the Bubble Lamp IP in connection with the purchase and offer for sale of furniture is likely to

cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Herman Miller and/or GNF with Plaintiffs, or as to the origin, sponsorship, or approval of Herman Miller's goods or commercial activities by another person.

266.    As a direct and proximate result of Herman Miller and GNF's continuing unauthorized use of the Nelson Marks and the Bubble Lamp IP, the Estate and Mico have suffered and will continue to suffer substantial injury to the business, reputation, and goodwill of George Nelson's legacy.

267.    By using the Nelson Marks and the Bubble Lamp IP without the Estate's and Mico's approval or consent, Herman Miller and GNF have willfully infringed the Estate's and Mico's rights with the intent to trade upon the fame and goodwill associated with the Nelson Marks and the Bubble Lamp IP.

268.    Herman Miller and GNF's acts as alleged herein were committed with the intent to pass off their goods and services as the goods and services of, approved by, sponsored by, or affiliated with Plaintiffs, and with the intent to deceive and defraud the public.

269.    The intentional nature of Herman Miller's and GNF's wrongful acts renders this case exceptional.

270.    The Estate and Mico are entitled to actual damages, lost profits, enhanced damages, interest, fees, costs, and all other relief this Court deems just and proper under the circumstances.

271.    The Estate and Mico have been, are now, and will be irreparably harmed by Herman Miller's and GNF's wrongful acts, unless enjoined by this Court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

## COUNT VI

### CANCELLATION OF THE FRAUDULENTLY OBTAINED AND MAINTAINED MODERNICA DESIGN REGISTRATIONS PURSUANT TO 15 U.S.C. §§ 1119, 1052(d)
(*The Estate of Jacqueline Nelson v. Herman Miller*)

272.     Paragraphs 1 through 182 are incorporated herein as if set forth in full.

273.     As explained above, the Estate of Jacqueline Nelson is the owner of the Nelson IP, including but not limited to the Nelson Marks and the Bubble Lamp IP.

274.     As set forth in detail above, the Modernica Design Registrations (which infringe the Bubble Lamp IP) were fraudulently obtained by Modernica, then fraudulently transferred to Herman Miller—who continues to use the marks that are the subject of the Modernica Design Registrations and fraudulently obtained incontestable status for those registrations in further violation of the Estate's rights

275.     As a result of the foregoing, the Modernica Design Registrations were maintained fraudulently by Herman Miller, are null and void and should be cancelled immediately.

## COUNT VII

### BREACH OF CONTRACT (in the alternative)
(*Plaintiffs v. Defendants*)

276.     Paragraphs 1 through 182 are incorporated herein as if set forth in full.

277.     Assuming, in the alternative, that the IPAA is a valid and binding contract (which inures to the benefit of Mico Nelson upon Jacqueline Nelson's death, and to Patrice Nelson upon Mico's death), it has been repeatedly breached by GNF and Herman Miller (of which GNF is an alter ego).

278.     Specifically, the IPAA acknowledges that "as consideration for the assignment of the Intellectual Property hereunder, [GNF] agrees that all royalties otherwise payable to [GNF] in connection with any (existing or future) license or assignment to any third party of the Intellectual

49

Property . . . be paid to [Mrs. Nelson] and/or her heirs, assignees, or successors (as applicable)."

Ex. C.

279.    The IPAA further provides that GNF "acknowledges that [Mrs. Nelson] shall have approval rights over any changes or modifications to the [Herman Miller License] or VDM Licenses – and any new licenses – during her lifetime."  Ex. C.

280.    The IPAA also states that GNF "acknowledges and agrees that all royalties payable to [GNF] in connection with the license of any Intellectual Property to a third party is and continues to be for the benefit of [Mrs. Nelson] and/or her heirs, assignees, or successors."  Ex. C.

281.    Finally, the IPAA makes clear that GNF "shall not assign or otherwise transfer this Agreement, or any of its rights or obligations under this Agreement, without the prior written approval of the other Party."  Ex. C.

282.    Here, there is no question that the foregoing terms of the IPAA (assuming it is valid) have been breached.

283.    As discussed above, neither GNF nor Herman Miller have paid Mico (or his mother, when she was alive, or Patrice), the requisite royalties—including but in no way limited to those referenced in Section VI above.

284.    Nor did they allow Mrs. Nelson or any of the other Plaintiffs any approval rights over any changes or modifications to licenses involving the Nelson IP—including but not limited to those proposed by Modernica during the settlement negotiations in the Bubble Lamp Lawsuit and Eames Lawsuit.

285.    Finally, while the IPAA expressly states that GNF "shall not assign or otherwise transfer this Agreement, or any of its rights or obligations under this Agreement, without the prior written approval of the other Party," GNF brashly violated this provision by transferring the

Bubble Lamp IP to Herman Miller by way of the omnibus settlement agreement of the Bubble Lamp Lawsuit and Eames Lawsuit. This transfer was not approved by Mrs. Nelson (who was alive at the time and should have been consulted).

286. As a result of GNF and Herman Miller's numerous breaches of the IPAA (assuming it is valid), Plaintiffs have suffered significant monetary damages for which they are entitled to relief, plus interest, fees, costs, and such other relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs for a judgment in their favor and against Defendants on its claims set forth above and request the following relief:

1. Entry of an order permanently enjoining Defendants, their officers, employees, agents, attorneys and all persons acting in concert, participation or combination with them from imitating, copying, licensing, or making unauthorized use of the Nelson Marks and Bubble Lamp IP, including, without limitation, by manufacturing, reproducing, displaying, promoting, offering for sale, selling, distributing, importing or exporting products bearing the Nelson Marks and Bubble Lamp IP;

2. Entry of an order permanently enjoining Defendants and their officers, employees, agents, attorneys and all persons acting in concert, participation or combination with Defendants from engaging in other activity constituting unfair competition;

3. An award of monetary damages, including pre-judgment and post-judgment interest;

4. An award of enhanced damages based on Defendants' willful infringement and unfair competition;

5. An award of punitive damages;

6.      An award of Plaintiffs' reasonable attorneys' fees and costs as permitted by law;

7.      Cancellation of the Modernica Design Registrations; and

8.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby request a trial by jury of any issues so triable.

<br>

|                                | **Royer Cooper Cohen Braunfeld LLC**                    |
|--------------------------------|---------------------------------------------------------|

**Royer Cooper Cohen Braunfeld LLC**

By: */s/ Donna A. Tobin*
Donna A. Tobin, Esquire
Dated: September 17, 2021          1120 Avenue of the Americas, 4th Floor
New York, NY 10036
T: (212) 994-0454; F: (484) 362-2630
E: dtobin@rccblaw.com


**Norman, Hanson & DeTroy, LLC**

Doris V. Rygalski
(*to be admitted pro hac vice*)
Two Canal Plaza
P.O. Box 4600
Portland, ME  04112-4600
207.553.4704  (Direct)
207.775.0806  (Fax)
E: drygalski@nhdlaw.com

*Attorneys for Plaintiffs*